988 A.2d 1044

**CHICAGO TITLE INSURANCE COMPANY
f/u/o U.S. Bank National Association**

v.

**MARY B.**

**No. 2219, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Jan. 4, 2010.

Reconsideration Denied March 11, 2010.

306

T. Bruce Hanley, Richard Grason, IV (Kellie M. Gombeski, Boady & Farley, on brief), Towson, for Appellant.

John J. Condliffe (Shub-Condliffe, Condliffe & Silverstein, on brief), Towson, for Appellee.

Panel: EYLER, DEBORAH S., WRIGHT, GRAEFF, JJ.

EYLER, DEBORAH S., J.

Charles Lee Petr owns and once lived in a house located at 116 Kinship Road, in the Dundalk area of Baltimore County ("the Property"). He now is a ward of the Maryland Department of Corrections, where he is serving a 20–year prison sentence for second-degree rape of his niece, Mary B. Mary sued Petr in a civil action for battery, in the Circuit Court for Baltimore County ("the Tort Action"). On May 11, 2007, she obtained a judgment for $2,000,000 against him in that case. Post-judgment, Mary sought and obtained a writ of execution and the Sheriff levied on the Property by posting notice that it was to be sold. The Sheriff's Sale was scheduled and advertised for October 25, 2007.

On October 18, 2007, a week before the sale, Chicago Title Insurance Company ("Chicago"), for its own use and for the use of Aegis Funding Corporation ("Aegis"), filed suit against Mary B. and Petr,[1] also in the Circuit Court for Baltimore County, seeking to enjoin the Sheriff's Sale and to obtain a judgment declaring that it has a lien against the Property that takes priority over Mary B.'s judgment ("The Priority Suit" or "the case at bar"). Specifically, Chicago and Aegis maintained that Aegis held a deed of trust against the Property securing a loan for $150,000 that Aegis had made to Petr. The loan had been disbursed and the note and deed of trust had been signed on July 15, 2005. Through inadvertence, the deed of trust was not recorded in the Land Records of Baltimore County ("Land Records") until two years later, on October 9, 2007, after the Sheriff's Sale was advertised.

The court in the Priority Suit entered a temporary restraining order halting the Sheriff's Sale. Then, by consent of the parties, it issued a preliminary injunction delaying the sale

---

1. Chicago and Aegis Bank named Petr as a defendant "so that the lower court case would be a complete determination of all lienholders['] interests in the Property and ... to affect the title of the Property so as to provide public notice of the subject lawsuit."

until after the resolution of the case at bar, including all appeals. Mary B. filed a third-party complaint against Aegis, asserting that she had brought the Tort Action against Petr after examining the Land Records and determining that there was no debt owed against the Property.[2]

It later became known by the parties to the Priority Suit that, on August 13, 2007, before the Priority Suit was filed, Aegis had filed a petition for bankruptcy under Chapter 11 of the federal bankruptcy code, 11 U.S.C. § § 1101–74. On December 17, 2007, a few months after the Priority Suit litigation began, Aegis assigned the deed of trust to U.S. Bank National Association ("Bank"). Bank was substituted as a party in Aegis's place by notice filed May 23, 2008. Mary B. subsequently filed an Amended Third–Party Complaint against Bank,[3] and moved to strike the substitution. The court denied Mary B.'s motion on August 28, 2008.

Ultimately, Chicago/Bank and Mary B. each moved for summary judgment on the ground that the material facts were not in dispute and their lien had priority,[4] as a matter of statutory law. Chicago also argued priority of its lien based upon the doctrines of equitable conversion and equitable subrogation. After a hearing, the court found on the undisputed material facts that, by statute, Mary B.'s judgment took priority over Bank's deed of trust, and that Chicago's equitable arguments did not warrant a different result. By order dated September 26, 2008, and filed October 1, 2008, the court

_____

2. While captioned a "Third–Party Complaint," it actually was a counterclaim as Aegis already was a party to the action as a "use" plaintiff. *See* Rule 2–332(a) (third-party claim may be brought by a defendant against "a person not previously a party to the action"); *see also* Rule 2–331 (counterclaims may be brought by any party against any opposing party).

3. For the same reasons noted, *supra,* this actually was an amended counterclaim.

4. Mary B. moved for summary judgment both on the complaint and on her third-party complaint.

granted Mary B.'s cross-motion for summary judgment, and dissolved the preliminary injunction.

Thereafter, on November 7, 2008, by stipulation of the parties, the court resolved the remaining claim against Petr by entering a judgment declaring that Petr is the owner of the Property; that Aegis's deed of trust dated July 15, 2005, which was recorded in the Land Records on October 9, 2007, had been transferred to Bank; that that assignment had further been recorded; and that Petr is not entitled to receive any proceeds from the sale of the Property until all other lienholders have been paid. Chicago and Bank noted this appeal and Mary B. noted a cross-appeal.

In the appeal, Chicago and Bank present three questions that, combined, ask whether the circuit court erred in granting summary judgment for Mary B. and not granting summary judgment for them.

In her cross-appeal, Mary B. poses two questions concerning procedural rulings by the circuit court. First, she asks whether the court erred in ruling that the automatic stay provisions of the federal bankruptcy code applied to Aegis; and, second, she asks whether the court erred in substituting Bank as a party defendant in place of Aegis, instead of merely adding Bank as a defendant.

For the following reasons, we shall reverse the judgment of the circuit court and remand the case to that court for further proceedings. Additional facts will be included in our discussion of the issues.

## DISCUSSION

### *Appeal*

On June 29, 2004, Petr and a woman named Rosemary B. Warnock owned the Property and obtained a $110,500 loan ("the initial loan") from Aegis, secured by a deed of trust. A little over a year later, on July 14, 2005, Warnock transferred her interest in the Property to Petr and he became the sole

owner.[5] The next day, he refinanced by means of a new
"refinance" loan for $150,000 from Aegis, secured by a new
deed of trust ("the DOT") on the Property. The refinance
loan was used to pay off the balance of the initial loan to
Aegis.[6] A certificate of satisfaction of the initial loan was
recorded in the Land Records on August 29, 2005.

As already noted, the refinance loan from Aegis was dis-
bursed to Petr on July 15, 2005. At that time, Petr executed
the new note and the DOT.

Mary's sad history with Petr began before then. In 2002,
when she was 12 years old, Mary needed a place to live
because her mother was mentally ill and could not care for
her, and her father was unknown to her. Mary went to live
with her aunt Linda B., who was living with Petr, her boy-
friend. Soon after Mary moved in with the couple, Petr
started making sexual advances toward her. After she turned
13, he engaged her in sexual intercourse and other sex acts.
By the time Mary B. was 14, she had been impregnated twice
by Petr: the first pregnancy ended in a miscarriage; the
second resulted in the birth of a son, Jesse B.[7]

Mary B. and her son continued to live with Petr and Linda
B., and Petr continued to victimize her. When Mary was 16,
she confided in a friend (who had become suspicious when
Petr acted oddly protective of Mary B.), disclosing the sexual
abuse she was enduring at Petr's hands. With the friend's
encouragement, Mary reported the abuse to her school coun-
selor. In 2006, the local department of social services inter-
vened, removing Mary and Jesse from Petr and Linda B.'s
home and placing them in foster care. Sometime thereafter,

---

**5.** The record does not reflect the relationship between Petr and War-
nock.

**6.** In fact, Chase Home Finance, LLC, had purchased that loan from
Aegis, and therefore it was Chase that received the pay-off amount.

**7.** In this Court, counsel for Mary B. moved to re-caption the case on
appeal so as not to disclose Mary's last name. The appellants agreed to
that request, and the motion was granted on April 27, 2009.

but no later than early 2007, Linda and Petr were married and Linda took the surname B.—Petr.

In the ensuing Child in Need of Assistance (CINA) proceeding, Mary B. was represented by a lawyer who advised her that she might be able to recover damages in a civil action for battery against Petr. The CINA lawyer searched the Land Records and determined that there was no lien of any sort against the Property. The CINA lawyer referred Mary to another lawyer who, on October 26, 2006, filed the Tort Action on Mary's behalf. Mary B.'s CINA lawyer acted as her next friend in the Tort Action. Prior to filing suit, Mary's lawyer again checked the status of the Property and saw that there were no liens recorded against it. At various times during the pendency of the Tort Action, Mary's lawyer re-checked the Land Records and reconfirmed that the Property was not subject to a recorded security interest.

After Petr and Linda were married, Petr conveyed the Property to himself and Linda as tenants by the entireties. Ultimately, the court in the Tort Action set that sale aside as a fraudulent conveyance. Petr remains the sole owner of the Property.

On May 10 and 11, 2007, the Tort Action was tried to the court. Petr represented himself. A verdict in favor of Mary B. was rendered on May 11, 2007. That same day, the court entered judgment for $2,000,000 in favor of Mary and against Petr. Mary then took measures to execute on the judgment. On June 12, 2007, at Mary's request, the clerk of court issued a writ of execution listing Mary as the judgment creditor and Petr as the judgment debtor and directing the Sheriff to levy upon the judgment debtor's property to satisfy Mary's money judgment. The Sheriff executed and levied on the Property on June 15, 2007, by posting. As we have explained, the Property then was scheduled and advertised for sale.

Mary B.'s judgment against Petr in the Tort Action came into being after July 15, 2005, when Petr executed the DOT together with the note for the refinance loan, but before the DOT was recorded in the Land Records on October 9, 2007.

The primary question in this appeal is, as between the DOT and Mary's judgment, which has priority?

█ The parties agree that, legally, that issue is controlled by Md.Code (2003 Repl.Vol.) section 3–201 of the Real Property Article ("RP"), entitled "Effective date of a deed," which provides:

> The effective date of a deed [8] is the date of delivery, and the date of delivery is presumed to be the date of the last acknowledgment, if any, or the date stated on the deed, whichever is later. Every deed, when recorded, takes effect from its effective date as against the grantor, his personal representatives, every purchaser with notice of the deed, and every creditor of the grantor with or without notice.

Chicago argues that the plain language of this statute means that the DOT, as recorded on October 9, 2007, was effective as of July 15, 2005, the day it was executed, as to every creditor of Petr, regardless of notice; and that Mary was and is a creditor of Petr. Therefore, the DOT takes priority over the judgment. Mary counters that a judgment lienholder is not merely a creditor within the meaning of RP section 3–201; rather, a judgment creditor who has become a lienholder against the Property takes priority over the holder of a DOT against the Property that was signed before the judgment was entered.[9]

Md.Code (2006 Repl.Vol.) section 11–401 *et seq.* of the Courts and Judicial Proceedings Article ("CJP"), and Rules 2–601 *et seq.* concern judgments and, in particular, judgment liens. CJP section 11–401(c)(1) defines a "Money judgment" as "a judgment determining that a specified amount of money is immediately payable to the judgment creditor." CJP section 11–402(b) and Rule 2–621(a) each provide that a money judgment that is recorded and indexed in a particular county's circuit court is a lien against real property of the judgment

---

**8.** RP section 1 101(c) defines a "deed" to include a "deed of trust."

**9.** A "lienholder" is "[a] person having or owning a lien." BLACK'S LAW DICTIONARY 944 (8th ed.2004).

debtor located in that county. In the case at bar, the judgment in the Tort Action was recorded and indexed in the Circuit Court for Baltimore County on the day it was docketed (May 11, 2007), as the action was pending in that county, and it became a lien on the Property that same day, because the Property is located in Baltimore County.[10] Thus, on May 11, 2007, Mary obtained a judgment lien against the Property for $2,000,000, plus post-judgment interest.

As of June 15, 2007, Mary B.'s judgment lien had been perfected by a writ of execution and the Sheriff had levied on the Property by posting it for sale. Thus, Mary held an executed judgment lien that was subject merely to the sale of the Property by the Sheriff.

■■■■ A deed of trust is a security instrument against real property, similar to a mortgage. *See Bank of Commerce v. Lanahan*, 45 Md. 396, 407–08 (1876) (distinguishing between mortgages and deeds of trust). "The parties to a deed of trust to secure are the grantor (debtor), the grantee (trustee), and the *cestui que trust* (creditor)." RICHARD M. VENABLE, THE LAW OF REAL PROPERTY AND LEASEHOLD ESTATES IN MARYLAND 253 (1892). Unlike in a traditional mortgage, however, *the lender or creditor* has no right to take possession upon default, or to foreclose. *Id.* at 255. Instead, a deed of trust gives *the trustees* the right to sell the real property to satisfy the debt for which the deed of trust was given as security. A deed of trust thus constitutes a lien against the real property securing it. *Simard v. White*, 383 Md. 257, 287, 859 A.2d 168 (2004).

■■■■ The meaning of a statute, and of a rule, is a legal question. *Brown v. Daniel Realty Co.*, 409 Md. 565, 585, 976 A.2d 300 (2009); *Dixon v. Dep't of Public Safety & Corr. Servs.*, 175 Md.App. 384, 408, 927 A.2d 445 (2007). Under the rules of statutory construction, unless the words of a statute

---

**10.** If the Property had been located in another Maryland county, the judgment would have become a lien against it upon the judgment's being recorded and indexed, pursuant to Rule 2–623(a), in the circuit court for the county in which the Property was located. *See* CJP § 11–402(c) and Md. Rule 2–621(b).

or a rule are ambiguous, we give the words their ordinary
meaning. *Brown, supra,* 409 Md. at 585, 976 A.2d 300.

[I]f " ' "reasonably possible," ' " we read a statute "so ' "that
no word, phrase, clause or sentence is rendered surplusage
or meaningless," ' " *Del Marr v. Montgomery County,* 169
Md.App. 187, 207, 900 A.2d 243 (2006) (citations omitted),
*aff'd,* 397 Md. 308, 916 A.2d 1002 (2007), or "superfluous or
redundant." *Blondell v. Baltimore City Police Dep't.,* 341
Md. 680, 691, 672 A.2d 639 (1996); *see Collins [v. State],* 383
Md. [684,] 691, 861 A.2d 727 [ (2004) ]; *Eng'g Mgmt. Servs.,
Inc. v. Md. State Highway Admin.,* 375 Md. 211, 224, 825
A.2d 966 (2003); *Mayor & Council of Rockville v. Rylyns
Enters., Inc.,* 372 Md. 514, 551, 814 A.2d 469 (2002). Fur-
ther, we are obligated to construe the statute as a whole, so
that all provisions are considered together and, to the extent
possible, reconciled and harmonized. *Deville [v. State],* 383
Md. [217,] 223, 858 A.2d 484 [ (2004) ]; *Navarro–Monzo v.
Washington Adventist,* 380 Md. 195, 204, 844 A.2d 406
(2004). Where "appropriate," we interpret a provision "in
the context of the entire statutory scheme of which it is a
part." *Gordon Family Partnership v. Gar on Jer,* 348 Md.
129, 138, 702 A.2d 753 (1997).

*Dixon, supra,* 175 Md.App. at 409–10, 927 A.2d 445. If the
words of a statute or a rule are ambiguous, we " 'consider not
only the literal or usual meaning of the words, but their
meaning and effect in light of the setting, the objectives and
purpose of that enactment.' " *Fraternal Order of Police v.
Mehrling,* 343 Md. 155, 174, 680 A.2d 1052 (1996) (citation
omitted).

We return to RP section 3–201, which appears in Subtitle 2
of Title 3 of the Real Property Article. Title 3 governs
"Recordation." Subtitle 2 is entitled "Priorities Based on Re-
cording." Under RP section 3–201—"Effective date of a
deed"—the "effective date of a deed is the date of delivery."
The delivery date is presumed to be the last date of acknowl-
edgment or "the date stated on the deed, whichever is later."
*Id.* In the case at bar, the date on the DOT and the date of the

last acknowledgment on the DOT are the same: July 15, 2005. Therefore, the "effective date" of the DOT was July 15, 2005.

Section 3–201 further provides, in relevant part, that "[e]very deed, when recorded, takes effect from its effective date as against ... every purchaser with notice of the deed, and every creditor of the grantor with or without notice." Mary B. is not a "purchaser" of the Property, whether bona fide for value or otherwise. *Eastern Shore Bldg. & Loan Corp. v. Bank of Somerset,* 253 Md. 525, 530, 253 A.2d 367 (1969) (quoting *Stebbins–Anderson Co. v. Bolton,* 208 Md. 183, 188, 117 A.2d 908 (1955) (stating that a judgment creditor is not a bona fide purchaser for value)). Within the meaning of the words in RP section 3–201, Mary B. only can be a "creditor" of Petr.

A deed that has been recorded, as the DOT was on October 9, 2007, is effective from its effective date—here, July 15, 2005—as against "every creditor of the grantor (here Petr) with or without notice." RP § 3–201 (emphasis added). This language plainly means that a recorded deed of trust is effective against any creditor of the person who granted the deed of trust as of the date the deed of trust was delivered (not the date it was recorded) regardless of whether the creditor did or did not have notice of the deed of trust at any time. Giving these words their ordinary meaning, the DOT was effective against Mary B. from July 15, 2005, which is almost two years before the date her judgment was rendered, irrespective of whether she knew about the DOT. Thus, the DOT is a lien that takes priority over the judgment.

We have found no support in Maryland law for Mary B's assertion that, as the holder of a judgment lien (and one that had been perfected at that), she was not a "creditor" of Petr within the meaning of RP section 3–201, and therefore as against the Property her judgment occupied a priority position *vis-à-vis* the DOT. "Creditor" is a broad term that means "[o]ne to whom a debt is owed." BLACK'S LAW DICTIONARY, *supra,* at 396. By virtue of the judgment, Mary is a person to whom Petr owes a debt of $2,000,000, plus post-judgment interest. Therefore, within the ordinary meaning of the word

"creditor," Mary is a creditor of Petr. There are many kinds of creditors, and RP section 3–201 does not draw any distinction based upon what type of creditor a creditor is. Mary is a judgment creditor, who holds a lien against the Property by virtue of her recorded judgment against Petr, and who has executed on the lien to the extent that the Property was seized by the Sheriff's Office and was about to be sold to satisfy (in part) her judgment against Petr. Nevertheless, she remains a creditor of Petr and, therefore, the DOT is effective against her regardless of whether she knew of it at any time.[11]

 Mary B. appears to believe that the term "creditor" as used in RP section 3–201 means a "general creditor." A general creditor of a debtor has no legal right or interest in the debtor's property. *Van Royen v. Lacey*, 262 Md. 94, 99, 277 A.2d 13 (1971). He does not have a security interest in a property of the debtor that enables him to sell the property and use the proceeds of the sale to pay down the debt. A general creditor may sue the debtor in contract, but even upon obtaining a verdict in his favor, he has no right against a particular property of the debtor. Only upon obtaining a properly recorded and indexed judgment for the debt does the general creditor become a judgment creditor with a lien against the debtor's real property. Nevertheless, the judgment creditor/lienholder still is a creditor of the judgment debtor. Mary B. would have us interpret "creditor" in RP section 3–201 to mean only a general creditor, and not a creditor who has obtained a judgment or holds a lien.

 There are two solid reasons that militate against such an interpretation. First, it is not our function as an appellate

---

11. At oral argument, Mary B.'s counsel suggested we look to Md.Code (2002 Repl.Vol., 2009 Supp.) section 1–201(12) of the Commercial Law Article ("CL"), for the definition of "creditor." That definition applies only to Titles 1 through 10 of the Commercial Law Article, which constitute the Maryland Uniform Commercial Code. CL § 1–101,–201. Accordingly, the definition is not relevant here. Even if it were, it is not helpful to Mary B. It defines a "creditor" as a "general creditor, a secured creditor, a lien creditor and any representative of creditors...." In this case, Mary B.'s status as a judgment creditor is no different than the status of a lien creditor.

court to add words to a statute when the legislature could have added them but did not. Had the General Assembly wanted to limit the type of creditors who take subject to a previously effective deed (including a deed of trust), with or without notice, to general creditors, it would have done so. It did not. *See Brooks v. Housing Authority*, 411 Md. 603, 984 A.2d 836, 2009 Md. LEXIS 848 at *30–32 (2009) (noting that, when the General Assembly intends to limit a statute, it knows how to do so expressly); *see also WCI v. Geiger*, 371 Md. 125, 142, 807 A.2d 32 (2002) ("We neither add words to, nor delete words from, a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature chose to use.").

Second, the qualification Mary B. advocates would make no sense considering the entire language of RP section 3–201 and its purpose. As we have noted, the statute divides those who have a right against the real property of a grantor of a deed, including a deed of trust, into two categories: purchasers and creditors. In this context, a purchaser is not a creditor, and vice versa. Having divided the world of competitors for the property into creditors and purchasers, it then establishes priorities among and between them, which, of course, is the point of the statute. If "creditors" as used in RP section 3–201 is read to mean general creditors only, the statute will not cover all of the many other types of creditors that may exist, including judgment creditors and lienholders. It is impossible to establish priorities without including the entire world of people/entities that are competing for priority. The very purpose of the statute would be defeated if we were to read it the way Mary B. argues we should.

Chicago argues that *Angelos v. Maryland Cas. Co.*, 38 Md.App. 265, 380 A.2d 646 (1977), supports its position in this appeal. In that case, on July 18, 1975, a real property owner executed a third mortgage against his property. The third mortgage, which was in favor of a lawyer who was representing the owner, was not recorded at the time of execution, but was recorded a little more than a month later, on August 27, 1975. In the interim, a lawsuit had been filed against the

property owner. On February 2, 1977, a judgment was entered against the property owner in the lawsuit. After the property was sold in a second mortgage foreclosure sale, the circuit court was asked to decide the priorities between the third mortgage holder and the judgment creditor with respect to the surplus proceeds of the sale. The circuit court ruled that the judgment creditor took priority over the mortgage holder.

On appeal, this Court reversed, holding that, under RP section 3–201, the third mortgage took effect against the judgment creditor as of the date it (the third mortgage) was executed. Accordingly, it was inconsequential to the issue of priority that the lawsuit resulting in the judgment had been filed before the third mortgage was recorded.

Mary B. argues that *Angelos* is distinguishable because, in that case, the third mortgage was recorded before the judgment was entered. That difference in chronology was not relevant, however, to the ultimate holding of this Court: that, under RP section 3–201, the third mortgage took effect as of the date of its execution whether or not the judgment creditor (or, in *Angelos,* the potential judgment creditor) had notice. Thus, we agree that *Angelos* supports Chicago's position. That position also is supported, even more strongly, by *Knell v. Green St. Bldg. Ass'n,* 34 Md. 67 (1871), which holds that a judgment obtained after the execution, but before the recording, of a previously executed mortgage does not take priority over the mortgage. Indeed, the wording of RP section 3–201 incorporates the holding in *Knell. Angelos,* 38 Md.App. at 268 n. 3, 380 A.2d 646.

Accordingly, the DOT, effective as it was on July 15, 2005, has priority over Mary B.'s later-recorded judgment, even though the DOT was recorded after the judgment was entered and recorded and Mary B. did not have notice of the DOT when she brought the Tort Action and when she obtained her judgment in that action.

### *Cross–Appeal*

We will address Mary B.'s two questions on cross-appeal together as they relate to the same issue. Mary B. first asks this Court to hold that the circuit court erred in concluding that the automatic stay provisions of the federal bankruptcy code applied to Aegis. She also asks whether the circuit court erred in allowing the substitution of Bank for Aegis. She asks this Court to hold that both Bank and Aegis "are proper parties in securing the bond" posted in the circuit court in light of the substitution of Bank for Aegis in the circuit court.

When, at the inception of the instant case, the circuit court entered a preliminary injunction staying the sale of the Property by consent of the parties, it directed Chicago and Aegis to post a $350,000 bond. The bond was intended to indemnify Mary against monetary loss "resulting from a reduction in the value of the subject real property due to physical damage to the [Property] caused by the delay created by the preliminary injunction." [12]

As already mentioned, unbeknownst to counsel for any of the parties, Aegis had filed for bankruptcy prior to the instigation of the Priority Suit. Also, less than two months after the Priority Suit was filed, Aegis transferred its interest in the DOT to Bank. Subsequently, Bank was substituted for Aegis as the use plaintiff. Mary B. moved to strike the substitution and filed an amended third-party complaint naming Bank as an additional third party defendant. Aegis then moved to strike the amended third-party complaint, arguing that it was unnecessary in light of the substitution.

In an order of the court dated August 28, 2008, denying Mary's Motion to Strike Substitution of Party, the circuit court declined to rule on Aegis's Motion to Strike Amended Third–Party Complaint until such time as the parties advised

---

12. It has been suggested by Mary's counsel that Linda B.-Petr, who apparently continues to live in the Property, has been purposefully damaging the Property to lower its value and diminish Mary's recovery. An anonymous letter also appears in the record that asks the circuit court to take action to stop Linda from further destroying the Property.

the court whether Aegis was permitted to so move in light of the bankruptcy case. Mary later responded to the circuit court's order with a memorandum setting forth her argument that the automatic stay provisions were inapplicable to Aegis in the case at bar. Aegis did not file a response. The circuit court subsequently ruled, on November 3, 2008, that it was not "in a position to make a determination that this litigation can continue against the stay" without confirmation from the Bankruptcy Court.

In her cross-appeal, Mary primarily is concerned that, "if she prevails in this appeal," both Aegis and Bank be considered "guarantors of the bond." Thus, because we are reversing the judgment of the circuit court and holding that the DOT has priority, Mary's cross-appeal appears to be moot.[13]

Moreover, as of the date of the circuit court's ruling referencing the bankruptcy stay with respect to the motion to strike the third party complaint, the circuit court already had granted Mary's cross-motion for summary judgment and, in effect, had granted judgment in her favor on the amended third-party complaint. Accordingly, the motion to strike the third-party complaint had been mooted. In any event, Chicago concedes, and we agree, that the automatic stay provisions of the United States Bankruptcy Code do not apply to Aegis because it commenced this action as the original "use" plaintiff *and* it already had filed for bankruptcy prior to the initiation of the Priority Suit. *See* 11 U.S.C. § 362(a) (stay provisions apply to judicial actions "against the debtor" and only to claims arising before commencement of bankruptcy proceedings).

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT**

---

**13.** We note that, with respect to the bond, on July 31, 2008, Chicago filed with the circuit court a General Surety Rider naming Bank as an additional guarantor under the bond. Accordingly, if Mary B. were to have executed on the bond, Chicago, Aegis and Bank all would have been liable as guarantors.

WITH THIS OPINION. COSTS TO BE PAID BY THE
APPELLEE/CROSS–APPELLANT.