# COLLEGES AND UNIVERSITIES

**ADMISSIONS – CRIMINAL HISTORY – WHETHER HIGHER EDUCATION INSTITUTIONS MAY RESCIND A STUDENT'S ADMISSION ON THE BASIS OF CRIMINAL HISTORY DISCOVERED AFTER ENROLLMENT – WHETHER THE MARYLAND FAIR ACCESS TO EDUCATION ACT APPLIES TO JUVENILE RECORDS**

February 18, 2021

*The Honorable Jason C. Buckel*
*House of Delegates of Maryland*

You have requested our opinion on two questions about the Maryland Fair Access to Education Act (the "Act"), which generally prohibits institutions of higher education from asking prospective students about criminal history on initial admissions applications but allows those institutions to later inquire into and consider criminal history in making "decisions regarding admission and access to campus residency." Md. Code Ann., Educ. ("ED") §§ 26-501 to -506. First, you ask whether the Act permits an institution to rescind an enrolled student's admission based on criminal history that the institution discovers after the student has enrolled at the institution, including to address concerns about campus safety. Second, you ask whether the Act permits an institution to inquire into and consider juvenile records as part of the admissions process.

Before we can answer your first question about whether an institution may rescind admission after a student has enrolled, it is necessary to understand when the Act permits an institution to deny admission based on criminal history or to rescind an *offer* of admission, before enrollment, based on such history. According to the Act's language and legislative history, the General Assembly apparently contemplated that an institution could adopt a two-step admissions process as it relates to criminal history. The first step— that is, the initial admissions application—must generally be blind to criminal history. *See* ED § 26-503. If, however, an institution chooses to ask about criminal history as a second step in the process—that is, as a separate inquiry following the submission of an application—the institution may then consider criminal history when making decisions about admission, as well as about campus residency, so long as it does not "automatically or unreasonably" restrict a student's admission on that basis. ED § 26-504. Although the Act also requires an institution to develop a written process to determine whether there is a relationship between a student's

3

criminal history and either campus residency or a specific academic program, *see* ED § 26-505, such a relationship is not the only ground related to criminal history on which an institution may deny admission. Instead, that provision appears to impose an *additional* requirement before an institution may limit an admitted student's options as compared to similarly situated students without criminal histories (or may deny admission when an applicant seeks admission only to a specific academic program), not to constrain the institution's discretion to deny admission to the institution more generally for other reasons related to criminal history, such as specific concerns about campus safety, when reasonable to do so. The Act similarly allows an institution to rescind an offer of admission, before the student has enrolled, based on criminal history, provided the decision is neither automatic nor unreasonable.

As to your first question about the rescission of admission *after* enrollment, then, a decision to rescind a student's admission after enrollment may raise procedural concerns that we do not address here, but it is nonetheless a "decision[] regarding admission" under the Act. ED § 26-504(a)(1). As such, while we doubt that the General Assembly intended this to be the primary way for institutions to address concerns about criminal history, especially given that the Act allows such concerns to be addressed much earlier in the process, the Act does not prohibit an institution from rescinding a student's admission based on criminal history discovered after enrollment, so long as the institution does not do so "automatically or unreasonably," ED § 26-504(b), and provides whatever process is due to the student. That said, though what is reasonable will depend on the circumstances, our sense is that it will generally be more difficult to say that an institution's decision to rescind a student's admission after enrollment is not "unreasonabl[e]" as compared to other "decisions regarding admission" made at an earlier stage in the process, and it will become increasingly difficult to avoid a conclusion of unreasonableness the longer the student has been enrolled at the institution.

As to your second question, we do not think that the Act applies directly to juvenile records, because an adjudication of delinquency in juvenile court is not a "criminal conviction" under Maryland law, and thus is not "criminal history" as defined by the Act. ED § 26-501(c) (defining "criminal history" as "an arrest or a criminal conviction"). Although a child under 18 years of age may be taken into custody pursuant to the law of "arrest," we doubt that the General Assembly intended to treat arrest and adjudication

records differently or to refer to juvenile proceedings—which, by design, are not criminal in nature—as "criminal history."

Rather, the General Assembly apparently assumed that juvenile records would remain confidential during the admissions process based on other existing law. Consistent with that understanding, our opinion is that Maryland's juvenile delinquency statute, which generally prohibits the disclosure of juvenile records, *see* Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-8A-27, prohibits an institution of higher education from inquiring into juvenile records as part of the admissions process, especially when that statute is read in conjunction with the Act. And although the Act does not directly address whether an institution may consider such juvenile records in the event that they are somehow divulged, we think that the State's policy to promote the admission of students with criminal records, *see* ED § 26-506, was likely intended to extend to students with juvenile records as well.

# I
## Background

### A. *Statutory Framework*

The Maryland Fair Access to Education Act prohibits institutions of higher education that receive State funds from using an undergraduate admissions application "that contains questions about the criminal history of the applicant." ED § 26-503(a); *see also* ED § 26-501(b) (defining "admissions application" as "an individual application to enroll as an undergraduate student at an institution of higher education").[1] An exception, however, permits institutions to use a third-party admissions application, such as the Common Application,[2] even if that application contains questions

---

[1] Although the "admissions application" provisions of the Act apply only to undergraduate admissions because the term "admissions application" is defined to include only undergraduate applications, it is not immediately clear whether the other provisions of the Act—which do not use the defined term "admissions application"—are similarly limited to the undergraduate level or whether they apply at the graduate level. Because you did not ask that question, we do not address whether the rest of the Act was intended to apply at the graduate level.

[2] As of August 1, 2019, the criminal history question was removed from the "common" portion of the Common Application. *See* Jen Davis, *Change to Criminal History Question for 2019-20 Application Year*

about an applicant's criminal history, but only "if the institution posts a notice on its website stating that a criminal history does not disqualify an applicant from admission." ED § 26-503(b); *see also* ED § 26-501(d) (defining "third-party admissions application" as "an admissions application not controlled by the institution"). The Act defines criminal history as "an arrest or a criminal conviction." ED § 26-501(c).

Although the Act generally prohibits institutions from asking about criminal history on the initial admissions application, the Act also provides that, "[s]ubject to § 26-505 of this subtitle, an institution . . . may make inquiries into and consider information about a student's criminal history for the purpose of: (1) [m]aking decisions regarding admission and access to campus residency; or (2) [o]ffering supportive counseling or services to help rehabilitate and educate the student on barriers a criminal record may present." ED § 26-504(a). In doing so, however, institutions "may not automatically or unreasonably restrict a student's admission based on that student's criminal history." ED § 26-504(b).

Additionally, "[i]n deciding to deny or limit a student's admission or access to campus residency under § 26-504 of [the Act], an institution . . . shall develop a process for determining whether there is a relationship between a student's criminal history and campus residency or a specific academic program." ED § 26-505(a). That process must be set forth in writing and "include" consideration of four factors:

> (1) The age of the student at the time any aspect of the student's criminal history occurred;
>
> (2) The time that has elapsed since any aspect of the student's criminal history occurred;
>
> (3) The nature of the criminal history; and
>
> (4) Any evidence of rehabilitation or good conduct produced by the student.

ED § 26-505(b).

Finally, institutions that use criminal history as permitted by the Act must "consider the State's policy to promote the admission

(Aug. 19, 2018), https://www.commonapp.org/blog/change-criminal-history-question-2019-2020-application-year.

of students with criminal records, including formerly incarcerated individuals, to provide these students with the opportunity to obtain the knowledge and skills needed to contribute to the State's economy." ED § 26-506.

## B. Legislative History

The General Assembly first adopted the legislation that would become the Act during the 2017 legislative session. *See* H.B. 694 and S.B. 543, 2017 Leg., Reg. Sess. After the Governor vetoed the bill, the Legislature voted to override that veto at the beginning of the 2018 legislative session, and the Act went into effect on February 11, 2018. *See* 2018 Md. Laws, ch. 2; *see also* Md. Const., Art. II, § 17(d) (providing that "[a]ny Bill enacted over the veto of the Governor . . . shall take effect 30 days after the Governor's veto is over-ridden, or on the date specified in the Bill, whichever is later").

As originally introduced, the bill prohibited institutions of higher education from making inquiries into or considering criminal history during the entire "admissions process," including "the submission of an application to attend an institution of higher education, all decisions made during the review of applications, and the selection of applicants to matriculate." H.B. 694, 2017 Leg., Reg. Sess. (First Reader) (proposed ED §§ 26-501(b), 26-503(a)). Thus, institutions could only inquire into and consider an accepted student's criminal history to: (1) make decisions regarding campus residency; (2) offer supportive counseling or services to help rehabilitate and educate the student on barriers a criminal record may present; or (3) decide whether the student may participate in activities and aspects of campus life usually open to students. *Id*. (proposed ED § 26-504(a)). Although institutions could use a student's criminal history for those limited purposes, the bill specifically prohibited institutions from "us[ing] any information about a student's criminal history to rescind an offer of admission." *Id*. (proposed ED § 26-504(b)(1)).

Once a student was accepted, the original bill also established a strict process to be used "[i]n deciding to deny or limit a student's access to campus residency or participation in a particular activity or aspect of campus life." *Id*. (proposed ED § 26-505). More specifically, the bill required institutions to develop "an individualized process for determining whether there is a direct relationship between a student's criminal history and campus residency or a particular activity or aspect of campus life." *Id*.

(proposed ED § 26-505(a)). A "direct relationship" meant that there was "a connection between the nature of the criminal history of an accepted student and an activity or aspect of campus life that would create an unreasonable risk to the safety or welfare of the accepted student, other individuals on campus, or campus property if the accepted student were authorized to participate without condition." *Id*. (proposed ED § 26-501(d)). The purpose of the individualized process was to "provide an affected student with reasonable notice and an opportunity to appeal a denial or limitation of campus residency, an activity, or an aspect of campus life." *Id*. (proposed ED § 26-505(c)). Thus, under the original bill, institutions were required to inform all students in writing of the availability of the individualized process and their right to provide evidence of rehabilitation or good conduct. *Id*. (proposed ED § 26-505(d)).

During committee hearings on the bill, representatives from the University System of Maryland, Johns Hopkins University, and the Maryland Independent College and University Association submitted testimony to express their concerns about criminal history discovered after admission and enrollment. *See Hearing on H.B. 694 Before the House Appropriations Comm.*, 2017 Leg., Reg. Sess. (Feb. 14, 2017); *Hearing on S.B. 543 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2017 Leg., Reg. Sess. (Feb. 15, 2017). For example, they raised concerns about what would happen if they accepted students with criminal histories into specific academic programs that the students might be unable to complete, such as teacher education or social work programs with required field placements for which those students might not qualify, or programs that prepare students for certain occupations where a criminal history might pose an issue for licensure, such as nursing. *See id.* (written testimony of University System of Maryland). In addition, they raised concerns about campus safety, emphasizing that they had an obligation to maintain a safe learning environment free from sexual assault and sexual harassment. *See id.* (written testimony of Johns Hopkins University and the Maryland Independent College and University Association).

Following committee hearings, the bill was significantly amended in the House. *See* H.B. 694, 2017 Leg., Reg. Sess. (Third Reader). Rather than prohibiting the use of criminal history throughout the entire "admissions process," the revised House bill only prohibited institutions (with limited exceptions) from using an undergraduate "admissions application" that contained questions about an applicant's criminal history. *Id*. (proposed ED § 26-503). Otherwise, the revised House bill allowed institutions to make

inquiries into and consider a student's criminal history for the purpose of, among other things, "[m]aking decisions regarding admission." *Id*. (proposed ED § 26-504(a)(1)). The revised House bill also no longer expressly prohibited institutions from rescinding a student's offer of admission based on criminal history. Rather, it prohibited institutions from "automatically or unreasonably" restricting a student's admission on that basis. *Id*. (proposed ED § 26-504(b)). But the revised House bill still required institutions to set forth in writing "a process for determining whether there is a direct relationship between a student's criminal history and campus residency, a specific academic program, or a particular activity or aspect of campus life." *Id*. (proposed ED § 26-505(a)). Notably, "specific academic program" had been added to that list.

The bill was amended even further in the Senate. *See* S.B. 543, 2017 Leg., Reg. Sess. (Third Reader). The revised Senate bill, for example, removed the ability of institutions to inquire into and consider criminal history for the purpose of "deciding whether the student may participate in activities and aspects of campus life usually open to students," shifting the focus to "decisions regarding admission and access to campus residency." *Id*. (proposed ED § 26-504(a)). The amendments also deleted the definition of, and all references to, a "direct relationship," leaving institutions to "develop a process for determining whether there is *a relationship* between a student's criminal history and campus residency or a specific academic program." *Id*. (proposed ED § 26-505(a)) (emphasis added).[3] Once the two bills were reconciled, they passed both houses of the General Assembly but were vetoed by the Governor.

When the General Assembly returned for the 2018 legislative session, debate ensued about whether to override the Governor's veto. In his veto message, the Governor had expressed concern that the bill "could lead to situations where a school unknowingly admits a student with a violent past or feels it must accept a student with a criminal history for fear of running afoul of the law." 2017 Md. Laws, Veto Messages at 4888. But Delegate McIntosh, a bill sponsor, told the House of Delegates that the Governor's veto

---

[3] In fact, the Senate amendments permitted, rather than required, institutions to develop a written process. *Id*. (proposed ED § 26-505(a)). In reconciling the two bills, however, the House reinstituted the *requirement* that institutions develop a written process, and the Senate concurred. *See* Senate Floor Proceedings No. 62 (Apr. 10, 2017); S.B. 543, 2017 Leg., Reg. Sess. (Enrolled Bill).

message had failed to consider the amendments that were made to the bill during the prior session. House Floor Proceedings No. 2 (Jan. 11, 2018). She explained that the amended bill did not prevent institutions from collecting criminal history information; instead, it merely "shift[ed] when [they] can do that" until after the initial admissions application. *Id.* At that point, she said, institutions, "upon review of the criminal record, may . . . deny [applicants] admission," repeating the word "may" twice for emphasis. *Id.* Then, if institutions "decide that [certain criminal offenses] happened so long ago that they still want to admit [those applicants]," she explained, institutions "can deny them housing and so on and so forth." *Id.*

Delegate McIntosh also praised the "bifurcated admissions process" that was in place at some institutions, under which criminal history information was sent to the human resources office and the application was sent to the admissions office. *Id.* That type of process, she said, much like the amended bill, puts the consideration of criminal history "at a point in the process where if someone otherwise qualifies to go to [an institution] they may be admitted, but it also gives the [institution] the right to deny that application." *Id.* In that way, she explained, the amended bill "very much mirrors what we have done with State employment." *Id.*[4] Along similar lines, Delegate McIntosh stated at one point that the main reason she had introduced the bill was to eliminate the deterrent effect that questions about criminal history had on the decision of those with a criminal history to apply in the first place, namely, that "so many people came up to that box" on the admissions application and, believing an institution would not admit them, "just took the application . . . and threw it away." *Id.* Finally, Delegate McIntosh clarified that the amended bill was not "prescribing" what each admissions office must decide for applicants with criminal histories. *Id.* To the contrary, even under the amended bill, she said that it would remain within "the purview of the [institutions to] choos[e] what students they want to admit." *Id.*

Similarly, in the Senate, Senator Conway, another bill sponsor, emphasized that there are multiple "steps in the admissions process." Senate Floor Proceedings No. 3 (Jan. 12, 2018). She explained that the bill would only prevent institutions

---

[4] Several years earlier, the General Assembly had prohibited an appointing authority from inquiring into the criminal record or criminal history of an applicant for State employment until the applicant had been provided an opportunity for an interview. *See* 2013 Md. Laws, ch. 160; Md. Code Ann., State Pers. & Pens. ("SPP") § 2-203.

from denying admission to applicants with criminal histories based on an "initial look at the application," and that institutions would still "be able to make the determination whether or not [they] want to accept these individuals into [the] institution." *Id*. At the same time, Senator Conway stated that the "admissions process" extended to specific academic programs so that, for example, a person convicted of hacking phones would not be accepted into a cybersecurity program, and a person convicted of selling opioids would not be accepted into a nursing program. *Id*. Before the final vote, Senator Rosapepe summarized Senator Conway's explanation of the bill: "The Chairwoman says, 'If that person is found to be a danger, they won't be let in.' So, this is a good bill, it makes all of us safer, and I am enthusiastic about voting to override the veto." *Id.* Ultimately, both houses of the Legislature voted to override the Governor's veto.

## C. *Procedural Considerations*

The Due Process Clause of the Fourteenth Amendment can also be implicated in admissions decisions at public institutions. *See* U.S. Const., Amend. XIV, § 1 (providing that no State shall "deprive any person of life, liberty, or property, without due process of law").[5] To have a constitutionally protected property interest in a benefit under the Due Process Clause, however, a person must have "a legitimate claim of entitlement to it," not merely an "abstract need or desire" or "unilateral expectation." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). As a result, applicants to public institutions of higher education

---

[5] The Due Process Clause does not apply to private institutions. *See Harwood v. Johns Hopkins Univ.*, 130 Md. App. 476, 484 (2000), *cert. denied*, 360 Md. 486 (2000) ("Although the actions of public universities are subject to due process scrutiny, private universities are not bound to provide students with the full range of due process protection."). Instead, "[w]hen a student is duly admitted by a private university," the Court of Special Appeals has found that "there is an implied contract between the student and the university that, if the student complies with the terms prescribed by the university, the student will obtain a degree." *Id*. at 483 (internal quotation marks, alterations, and citation omitted); *see also Onawola v. Johns Hopkins Univ*., 412 F. Supp. 2d 529, 532 (D. Md. 2006), *aff'd*, 221 F. App'x 211 (4th Cir. 2007). Thus, rather than ask whether due process was afforded to a student whose admission is rescinded based on criminal history, a Maryland court might ask whether a private institution has "live[d] up to the conditions of the agreement it made with a student" or has, instead, "acted arbitrarily and capriciously" toward the student. *Harwood*, 130 Md. App. at 484.

generally do not have a protected property interest in admission. *See, e.g.*, *Lemon v. Labette Cmty. Coll.*, 6 F. Supp. 3d 1246, 1251 (D. Kan. 2014) (finding no property interest in transfer admission to a nursing program). After all, such institutions have significant discretion in choosing whom they want to admit as students. *See, e.g.*, *Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.) ("The freedom of a university to make its own judgments as to education includes the selection of its student body."). But, as to a student's rights after admission, many courts have assumed, without deciding, that students have a protected property interest in their *continued* enrollment. *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985); *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002); *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 73 (4th Cir. 1983); *Doe v. Loh*, 2018 WL 1535495, at *5 (D. Md. Mar. 29, 2018).[6]

Once a student has enrolled, there is often a question as to whether a dismissal from the institution is disciplinary or academic in nature. *See Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976) ("There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals."). As a general matter, when a student is dismissed for violating rules of conduct, *i.e.*, a disciplinary dismissal, the student is entitled to notice of the charges and an opportunity to be heard by disinterested parties. *See Henson*, 719 F.2d at 74. By contrast, a student's dismissal for failure to meet academic standards, *i.e.*, an academic dismissal, "calls for far less stringent procedural requirements." *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 86-90 (1978). In that category of cases, a hearing is not required; the student must merely be "fully informed" of the institution's dissatisfaction, and the dismissal decision must be "careful and deliberate." *Id.* at 85. Academic dismissals are treated differently because they require "an expert

---

[6] There is also some question as to whether a protected property interest arises where a student has accepted an offer of admission but has not yet enrolled. *Compare Martin v. Helstad*, 699 F.2d 387, 389-90 (7th Cir. 1983) (noting the district court's holding that a property interest arose based on the university's offer of admission and the student's acceptance of that offer, and assuming such an interest existed for purposes of deciding the case), *with id.* at 392 (Coffey, J., concurring) (positing that "the right of a university to make its own judgments as to the selection of its student body is so vital to the important concept of academic freedom that a mere potential student enrollee . . . cannot, prior to formal enrollment and matriculation, acquire a property right in attending a particular university"). We do not resolve that question here.

evaluation of cumulative information" and thus are "not readily adopted to the procedural tools of judicial or administrative decision-making." *Id*. at 90.[7]

In the few reported cases involving an institution's decision to "rescind" a student's admission based on criminal history, the institution did so because the student had allegedly failed to disclose or misrepresented that criminal history when asked about it. For example, in *Fuller v. Schoolcraft College*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012), a student was terminated from a nursing program "as a result of her criminal history and lack of candor about it." Because the termination "pertain[ed] to her ability to function as a nurse and provide quality patient care," the court called it an "academic dismissal" and concluded that she had been afforded due process when she was informed of the reasons for her termination and the final decision was "careful and deliberate." *Id*. at 876-78. Similarly, in *Martin v. Helstad*, a law school revoked the admission of a newly accepted student on the grounds that his application "had failed to disclose his federal conviction" and that his responses to the school's inquiries misleadingly "implied that his federal conviction was about to be vacated." 699 F.2d at 388. The court did not decide the type of dismissal but stated that it was "colorably an academic dismissal" and—assuming that a protected property interest existed—concluded that the student had received due process when he was given an opportunity to submit written materials prior to the school's final decision. *Id*. at 390-91.[8]

---

[7] Although the courts have been primarily concerned with procedural due process in these cases, substantive due process has also been implicated when there has been an allegation that the institution acted arbitrarily and capriciously. *See, e.g.*, *Horowitz*, 435 U.S. at 91-92.

[8] Ultimately, "[t]here is no bright-line test for determining whether a dismissal is academic or disciplinary in nature," *Fuller*, 909 F. Supp. 2d at 874, and "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation," *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961). You have not asked, and this opinion does not address, precisely what process is due in any given situation, nor do these cases address the situation where a student's criminal history is properly disclosed and an institution nevertheless rescinds the student's admission based on that criminal history.

**II**
**Analysis**

*A.    Rescinding Admission*

Your first question, as we understand it, is whether the Act permits an institution of higher education to rescind a student's admission based on criminal history that the institution discovered after the student enrolled.[9]  To answer that question, we apply the ordinary principles of statutory construction "to ascertain and effectuate the intent of the Legislature." *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 358 (2013) (internal citation omitted). We begin with "the normal, plain meaning of the statute," *State v. Bey*, 452 Md. 255, 265 (2017) (internal citation omitted), reading words with "their natural and ordinary meaning," *Davis v. State*, 426 Md. 211, 218 (2012).  We do not read statutory language "in a vacuum," but rather in "the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Lockshin v. Semsker*, 412 Md. 257, 275-276 (2010).  If the language "is unambiguous and clearly consistent with the statute's apparent purpose," then the inquiry ordinarily ends there.  *Id.* at 275.  If the language is ambiguous, however, then we look to other indicia of intent, such as the legislative history, including "the derivation of the statute, comments and explanations . . . during the legislative process, and amendments proposed or added to it." *Witte v. Azarian*, 369 Md. 518, 525-26 (2002).

We thus start with the language of the Act.  Although that language makes clear that an institution generally "may not use an admissions application that contains questions about the criminal history of the applicant," ED § 26-503, it also makes clear that, otherwise, the admissions process need not be blind to criminal history.  Rather, the Act provides that, "[s]ubject to § 26-505 of this subtitle, an institution . . . may make inquiries into and consider information about a student's criminal history for the purpose of . . . [m]aking decisions regarding admission and access to campus residency," though the institution "may not automatically or unreasonably restrict a student's admission based on that student's

---

[9] You have asked specifically about the discovery of a student's criminal history after enrollment.  But, to be clear, regardless of whether an institution is aware of criminal history at the time of admission or subsequently discovers it, the institution's use of that information is subject to the Act's requirements.

criminal history." ED § 26-504.[10] That rule, however, is complicated by the fact that it is expressly made "subject to § 26-505," which, in turn, states that, "[i]n deciding to deny or limit a student's admission or access to campus residency under § 26-504," an institution "shall develop a process for determining whether there is a relationship between a student's criminal history and campus residency or a specific academic program." ED § 26-505. Thus, there is a question as to whether an institution may only make "decisions regarding admission" based on criminal history if it determines, through its written process, that there is a "relationship between a student's criminal history and . . . a specific academic program." ED § 26-505.

Before turning to your question, then, we must determine when an institution may *deny* admission based on criminal history, as that might affect an institution's ability, if any, to later rescind a student's admission based on such history. On this preliminary matter, the key question is whether an institution may deny admission based on criminal history only if it determines that there is a "relationship between a student's criminal history and . . . a specific academic program," ED § 26-505, or whether an institution may deny admission based on criminal history for other reasons as well, such as to address concerns about campus safety.

The answer to that question largely depends on how ED §§ 26-504 and 26-505 are supposed to be read together. The first possible reading is that—because ED § 26-504 is "subject to" ED § 26-505—an institution may deny admission under § 26-504 only if it determines, using its written process under § 26-505, that there is a "relationship between that student's criminal history and . . . a specific academic program." Under that reading, if such a relationship does not exist, then an institution could not deny admission based on that student's criminal history. In other words, the only basis to deny admission under the Act would be when a student's criminal history might interfere with their ability to complete the specific academic program to which they applied or their ability to enter the field connected to that program after

---

[10] The Act also permits an institution to make inquiries into and consider a student's criminal history for the purpose of "[o]ffering supportive counseling or services to help rehabilitate and educate the student on barriers a criminal record may present," ED § 26-504(a)(2), but we do not discuss that provision here because it is not relevant to your question.

graduation.[11]   This first reading would therefore mean that an institution could not deny admission based on criminal history unless a student was applying to a "specific academic program," such as a nursing program, and the institution determined there was a "relationship" between the student's criminal history and that program.

By contrast, the second possible reading is that the written process under ED § 26-505 for determining whether there is a relationship between a student's criminal history and a specific academic program only comes into play once an institution decides, under ED § 26-504, that it wants to admit an applicant to the institution generally.  Under that reading, an institution would first be prohibited by ED § 26-504 from "automatically or unreasonably" restricting a student's admission to the institution based on that student's criminal history.[12]   And then, for those students the institution otherwise wants to admit and who are applying to a specific academic program (or for applicants who are applying only to a specific academic program), the institution would *also* have to determine, using its written process under ED § 26-505, whether there is a "relationship" between the student's criminal history and that program.  Thus, although the institution would have to use that written process when deciding whether "to deny or limit a student's admission [to a specific academic program]," the institution could still deny admission to the institution as a whole for reasons related to criminal history other than an identified "relationship between a student's criminal

---

[11] Because the term "specific academic program" is not expressly defined by the Act, we consider "its ordinary and common sense meaning." *Schreyer v. Chaplain*, 416 Md. 94, 101-02 (2010).   In common parlance, the word "program" is generally understood to mean "a planned, coordinated group of activities, procedures, etc., often for a specific purpose" or, alternatively, "a prospectus or syllabus." *Webster's New Universal Unabridged Dictionary* 1546 (2003).   That meaning also coincides with how the word "program" is used elsewhere in the Education Article.    *See* ED § 10-101(*l*) (defining "program" or "educational program" as "an organized course of study that leads to the award of a certificate, diploma, or degree").  We therefore interpret the term "specific academic program," as used in the Act, to encompass an organized course of study in a particular subject that leads to an academic credential.

[12] We read the word "restrict" in § 26-504 as encompassing a denial of admission, given that § 26-505 refers to an institution's decision "to *deny* or limit a student's admission . . . *under § 26-504*."  ED § 26-505 (emphases added).  In light of the linkage between those two provisions, "restrict[ing]" admission seems to include "deny[ing]" admission.

history and a specific academic program." ED § 26-505. For example, the institution could also deny admission based on specific concerns about campus safety that are related to a student's criminal history, provided the institution does not do so automatically or unreasonably.[13]

Although the statutory language is not entirely clear, our view is that the second reading is the more natural one. Section 26-504 specifically authorizes institutions to use criminal history when "[m]aking decisions regarding admission and access to campus residency," and it provides, as a limit on that general authorization, only that institutions "may not automatically or unreasonably restrict a student's admission." That section does not refer to "specific academic program[s]," a term which instead appears only in ED § 26-505, alongside the special rules that apply to decisions about "access to campus residency." Thus, to conclude that an institution may only deny admission based on criminal history when that history relates to a specific academic program, it would be necessary to add the words "to a specific academic program" after the phrase "decisions regarding admission" in ED § 26-504. That addition, however, would conflict with the principle of statutory construction that words ordinarily should not be added to a statute when the General Assembly decided not to include them. *See, e.g.*, *Whack v. State*, 338 Md. 665, 673 (1995) (explaining that courts ordinarily "will not add or delete words to obtain a meaning not otherwise evident from the statutory language").

What is more, it makes sense to have special rules for decisions about admission to specific academic programs and access to campus residency because they are most relevant to students who have already been accepted at an institution, who the Legislature might reasonably have thought were deserving of further procedural protections and who might also face stigma if they are excluded from programs or housing that are open to peers.[14] Although students might select their specific academic

---

[13] To be clear, if a student were admitted to an institution and later sought entry to a specific academic program within the institution, the written process would likely be implicated at that time because, even though the institution did not previously "deny" admission to the institution, a program restriction based on the student's criminal history would constitute a "limit" on admission under ED § 26-505.

[14] Meanwhile, for applicants who have applied for admission only to a specific academic program, those rules ensure that a careful review of

program (*e.g.*, choose a major) at the time of their application to the institution, students might also enter an institution without selecting their program of choice and decide to do so later during their time at the institution. The fact that institutions can decide whether to admit students before specific academic programs are even at issue suggests that admission to a specific academic program is an *additional* consideration with its own additional requirements under ED § 26-505 and that an institution's ability to deny admission to the institution as a whole is subject only to the more general limitation in ED § 26-504 that the institution may not restrict admission "automatically or unreasonably."

To be clear, that more general limitation in ED § 26-504 still requires the institution to have a "not . . . unreasonabl[e]" basis for denying admission, such as a specific concern about how a student's criminal history might pose a risk to campus safety. And the factors outlined as part of the written process in ED § 26-505 might well be relevant to that determination, even if they do not directly govern the decision.[15] But a relationship with a specific academic program would not be the only ground on which to deny admission based on criminal history.

Although it is true that ED § 26-504 is "subject to" ED § 26-505 (where the written process for specific academic programs is codified), the general rule in § 26-504 could just as easily be "subject to" § 26-505 in the sense that the written process in § 26-505 applies to "decisions regarding admission" *when those decisions are about admission to a specific academic program*, rather than when the institution is denying admission to the institution as a whole for other reasons related to criminal history. After all, the General Assembly could easily have prohibited institutions from denying admission to the institution *unless* there is a relationship between a student's criminal history and a specific academic program, but it did not use that language. *See Chicago Title Ins. Co. v. Mary B.*, 190 Md. App. 305, 317-18 (2010) ("[I]t is not our function as an appellate court to add words to a statute

---

criminal history occurs before a student commits to a program that the student might be unable to complete due to that history.

[15] As a reminder, those factors include: (1) the age of the student at the time any aspect of the student's criminal history occurred; (2) the time that has elapsed since any aspect of the student's criminal history occurred; (3) the nature of the criminal history; and (4) any evidence of rehabilitation or good conduct produced by the student. ED § 26-505(b).

when the legislature could have added them but did not.").[16]  We recognize, however, that the language of the statute is not entirely clear and that a court might find some ambiguity on this point.[17]

Given that potential ambiguity, we turn to the legislative history for guidance, *see Witte*, 369 Md. at 525-26, and the legislative history makes clear that the General Assembly intended

---

[16] Although one legislator suggested a compromise that would have permitted an institution to ask about criminal history only after admitting applicants and then permitted the institution to restrict admission based on criminal history only to the extent it "affects [the student's] ability to pursue a program," *Hearing on S.B. 543 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2017 Leg., Reg. Sess. (Feb. 15, 2017) (statement of Sen. Pinsky), that does not appear to be the compromise that was ultimately struck.  The revised bill did not require institutions to accept or reject applicants *before* inquiring into and considering criminal history, nor did it expressly state that an applicant's criminal history will not affect admission *unless* it affects their ability to pursue a specific academic program.

[17] Another potential ambiguity is that the Act uses the term "applicant" in ED § 26-503 when prohibiting questions about criminal history on the admissions application but uses the term "student" in ED §§ 26-504 through 26-506 when describing how institutions may use criminal history.  The use of the term "student" in those later provisions could imply that they refer to someone who has already been admitted and that, therefore, criminal history can only be taken into account in making decisions regarding admission after an "applicant" has been admitted to an institution and is a "student" seeking to enroll in a specific academic program at that institution.  *See, e.g.*, *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223 (2003) (explaining that "when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things," though noting that is "not an immutable rule").  However, drawing such a sharp distinction between those two terms ignores the fact that someone might apply directly to a specific academic program in the first place, and the General Assembly presumably intended the provisions in §§ 26-504 through 26-506 to cover that applicant, despite the use of the word "student."  When read in context and in light of the legislative history, the term "student" is more likely a vestige of the original bill, which applied only to admitted students because institutions were prohibited from taking criminal history into account in the admissions process at all.  *See* H.B. 694, 2017 Leg., Reg. Sess. (First Reader).  The revised bill, however, shifted that prohibition to the admissions application—thus introducing the term "applicant"—while expressly allowing consideration of criminal history in the admissions process.  *See* H.B. 694, 2017 Leg., Reg. Sess. (Third Reader).

the second reading of the Act, because the second reading is far more consistent with how the Act was described during the veto override proceedings at the beginning of the 2018 legislative session. As explained above, the Governor had vetoed the Act because he was concerned that the bill "could lead to situations where a school unknowingly admits a student with a violent past or feels it must accept a student with a criminal history for fear of running afoul of the law." 2017 Md. Laws, Veto Messages at 4888. That concern reflected an understanding of the bill—similar to the first reading of the Act—where an institution would not be able to deny admission based on concerns about campus safety but, rather, only when there is a relationship between a student's criminal history and a specific academic program.

In responding to that concern, however, Delegate McIntosh, a bill sponsor, explained that the Governor had failed to consider that the amended bill allowed institutions to inquire into criminal history, merely "shift[ed] when [they] can do that" until after the initial admissions application, and did not "prescrib[e]" what admissions offices must decide with regard to applicants with criminal histories. House Floor Proceedings No. 2 (Jan. 11, 2018). Under the amended bill, she emphasized, institutions "upon review of the criminal record *may* . . . deny [applicants] admission" and then, if institutions decide "they still want to admit" applicants with criminal histories, "they can deny them housing and so on and so forth." *Id*. (emphasis added). She further explained that the bill's main goal, in her estimation, was to eliminate the deterrent effect that the mere presence of questions about criminal history on the admissions application had on potential applicants with criminal histories. *Id.* Finally, at one point, she noted that the bill "very much mirrors what [was] done with State employment," *id*., where such questions are deferred until later in the process—in that case, the interview stage—but an employer's discretion over whom to hire is not constrained, *see* SPP § 2-203.

That characterization reflects an altogether different reading of the statute from the Governor's—more like the second reading of the Act—under which institutions have the discretion to decide whether "they still want to admit" applicants despite their criminal histories and *then* have the further discretion, if the institution wants to admit such an applicant, to deny or limit access to campus residency or a specific academic program. In other words, it would authorize a two-step admissions process, "where if someone otherwise qualifies . . . they may be admitted," but the institution still has "the right to deny" admission based on the student's criminal history. House Floor Proceedings No. 2 (Jan. 11, 2018)

(statement of Del. McIntosh). Senator Conway, another a bill sponsor, likewise distinguished between an "initial look at the application" and the moment when institutions decide whether they "want to accept these individuals" after considering their criminal histories, concluding that institutions would still "be able to make the determination whether or not [they] want to accept these individuals into [the] institution." Senate Floor Proceedings No. 3 (Jan. 12, 2018).

Such statements from the bill's sponsors on the floor, "while not conclusive on legislative intent, are generally accorded some weight by the courts in determining the meaning of a statute." 87 *Opinions of the Attorney General* 106, 113 n.6 (2002). That is because "bill sponsors tend to know the details of their bills better than other members, so other members will often rely on their explanations when deciding how to vote." 103 *Opinions of the Attorney General* 18, 39 (2018) (citing Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 446 (1995)). That is also particularly true when, as here, the statements were made just prior to the final vote. *See Davis*, 426 Md. at 231 n.7 ("We rely on the testimony of the bill sponsor in determining the legislative intent[,] especially where there were minimal amendments to the bill introduced after that testimony.").[18]

Thus, to conclude that an institution cannot deny admission to the institution unless there is a relationship between a student's criminal history and a specific academic program would be more "prescri[ptive]" than the members of the General Assembly understood the Act to be when voting to override the Governor's veto. House Floor Proceedings No. 2 (Jan. 11, 2018) (statement of Del. McIntosh). Instead, in our view, the Act generally permits an institution to deny admission based on criminal history, including

---

[18] In fact, there is evidence here that at least one member relied on a bill sponsor's characterization of the bill. *See* Senate Floor Proceedings No. 3 (Jan. 12, 2018) (statement of Sen. Rosapepe) (summarizing his understanding of Senator Conway's explanation to mean that, "[i]f that person is found to be a danger, they won't be let in[,]" and, based on that understanding, expressing his support for overriding the Governor's veto).

to address specific concerns about campus safety, provided the institution does not do so automatically or unreasonably.[19]

With that understanding, the next logical question becomes whether an institution may rescind an offer of admission, before the student has actually enrolled, based on criminal history. In our view, the decision to rescind an *offer* of admission is just as much a "decision[] regarding admission," ED § 26-504, as the decision to deny admission in the first place. Thus, if an institution may deny admission on grounds other than a relationship between the student's criminal history and a specific academic program, such as specific concerns about campus safety, there is nothing in the Act that would prevent the institution from rescinding an offer of admission on those same grounds, provided the decision is not automatic or unreasonable. In fact, although the bill as originally proposed would have prohibited an institution from "us[ing] any information about a student's criminal history to rescind an offer of admission," that provision was removed as part of the amendment allowing an institution to consider criminal history when "[m]aking decisions regarding admission." H.B. 694, 2017 Leg., Reg. Sess. (Third Reader). The removal of that language confirms that an institution may rescind an offer of admission when otherwise permitted to take criminal history into account under the Act. *See, e.g.*, *SVF Riva Annapolis, LLC v. Gilroy*, 459 Md. 632, 647-48 (2018) (describing "amendments that were considered and/or enacted as the statute passed through the Legislature" as "persuasive evidence of legislative purpose"); *Harris v. State*, 331 Md. 137, 152 (1993) (concluding that an amendment deleting the word "possesses" from a criminal statute reflected the Legislature's intent to require more than mere possession of a handgun).

---

[19] Delegates McIntosh and Barron—both sponsors of the House bill—also submitted a letter to our Office to provide comments on this opinion request. They took the position in their letter that the Act does not permit institutions to deny or rescind admission based on criminal history unless there is a relationship between that history and a specific academic program. *See* Letter from Delegates Maggie McIntosh and Erek L. Barron to Attorney General Brian E. Frosh (Oct. 12, 2019). These comments, however, are not a substitute for pre-enactment legislative history, and a court would not defer to them. As the Court of Appeals has recognized, "little weight is to be accorded to post-enactment statements of legislative intent, even by the legislators who passed the particular law." *Building Materials Corp. of Am. v. Board of Educ. of Baltimore County*, 428 Md. 572, 592 (2012) (internal citation omitted).

As we understand it, however, the question you asked is whether the Act permits an institution to rescind an enrolled student's admission based on criminal history not discovered until *after* enrollment.[20] Although there may be a difference from a due process perspective between rescinding an offer of admission and rescinding admission after a student has enrolled at the institution, *see* footnote 6 *supra*, the Act does not differentiate between the two, at least not expressly. Rather, the Act allows an institution to consider criminal history when "[m]aking decisions regarding admission" as long as the institution does not "automatically or unreasonably restrict a student's admission" on that basis, ED § 26-504, and complies with the written process under ED § 26-505 when deciding whether to deny or limit a student's admission to a "specific academic program."

As an initial matter, therefore, we must decide whether a decision to rescind admission after enrollment would be a "decision[] regarding admission" under ED § 26-504. Given that courts have analyzed the decision to rescind a student's admission after enrollment in certain circumstances as a "dismissal," *see, e.g.*, *Fuller*, 909 F. Supp. 2d at 876, there is at least some question as to whether that decision is a "decision[] regarding *admission*" as contemplated by the Act, ED § 26-504 (emphasis added); *see also, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "admission" as "[t]he process of allowing people to *enter* a college, university, or other institution" (emphasis added)). In fact, it is not even clear whether institutions in Maryland have a process for rescinding admission after enrollment other than when a student misrepresented

---

[20] To be more precise, the question you asked was whether an institution may rescind *or suspend* a student's admission based on criminal history discovered after enrollment. The term "suspend" in the higher education context generally refers to a situation where an institution bars a student from attending classes and participating in campus activities for a specified period of time as a result of a finding of academic or non-academic misconduct, which does not seem to be directly applicable here. To the extent you are referring to a similarly temporary bar while an institution decides whether to rescind admission, we have found nothing to suggest that the Act authorizes a suspension of an enrolled student just so that an institution may make a "decision[] regarding admission" where no misconduct is alleged. But to the extent that you are referring to a temporary hold on the student's admission *before* enrollment to determine whether to rescind an *offer* of admission, that might well be permissible given that the General Assembly specifically deleted the language from the original bill that would have prohibited an institution from rescinding an offer of admission.

information during the admissions process, *cf. Fuller*, 909 F. Supp. 2d at 876; if they do, then such instances seem to be exceedingly rare.

But to the extent that the mere discovery of a student's criminal history involving conduct that occurred before enrollment causes an institution to reconsider the student's admission after enrollment, that decision appears to have more in common with a decision about admission than with a dismissal based on academic or disciplinary problems that arose after enrollment. After all, the institution is essentially deciding that it would not have admitted the student had it known of that criminal history at the time of admission. In that sense, then, it is more likely a "decision[] regarding admission" subject to the Act's requirements. Although the Act focuses primarily on the admissions process *before* enrollment, it also applies beyond a student's initial entry to the institution under at least some circumstances, given its additional requirements for campus residency and specific academic programs. For example, if a student is admitted to a specific academic program and the student's criminal history would prevent the student from completing the program, the General Assembly presumably intended an institution's authority to deny admission to the program on that ground, *see* ED § 26-505, to extend to the decision to rescind admission to the program; otherwise, a student who did not withdraw from the program would be left in limbo.[21]

Thus, in our view, the Act permits an institution to rescind a student's admission based on criminal history discovered after enrollment, but only if the institution does not make that decision "automatically or unreasonably." ED § 26-504(b). While we doubt that the General Assembly intended rescission after enrollment to be the primary way that institutions would address criminal history, especially given that the Act allows for consideration of criminal history in admissions well before that point, the language of the Act appears to leave room for an institution to make that decision subject to the same not-automatic-or-unreasonable standard that applies to other "decisions regarding admission." ED § 26-504.

---

[21] This interpretation is also bolstered at least somewhat by the fact that the General Assembly deleted the provision in the original bill that prohibited an institution from "us[ing] any information about a student's criminal history to rescind an offer of admission," though we acknowledge that this fact alone is not conclusive, as it does not directly address the rescission of admission *after* enrollment.

As a practical matter, however, the circumstances under which an institution may rescind a student's admission after enrollment will likely be narrower than the circumstances under which an institution may deny admission or even rescind an offer of admission before enrollment. After all, the decision to rescind admission, as with other decisions regarding admission under the Act, cannot be made "unreasonably," and a decision to rescind admission after enrollment raises equitable considerations (including reliance interests on the part of the student) that were not at play at earlier stages of the process and will inevitably factor into that reasonableness determination. Although what is reasonable will depend on the circumstances, our sense is that, if an institution seeks to rescind an enrolled student's admission on the basis of criminal history discovered after enrollment, it will generally be more difficult to say that the institution is not acting "unreasonably" in making that decision as compared to decisions made prior to enrollment, particularly when the institution could have inquired about the student's criminal history before the student enrolled. And it will likely become increasingly difficult, along a sliding scale, to say that a decision to rescind admission is not unreasonable the longer the student has been enrolled at the institution.[22]

With that note of caution, there will likely be some situations when rescission of admission after enrollment would be reasonable under the Act. For example, if a student failed to disclose or misrepresented his or her criminal history during the admissions process, it would likely be reasonable for an institution to rescind that student's admission. *Cf. Fuller*, 909 F. Supp. 2d at 876. And although we cannot foresee all of the individual factual situations that might arise, there will presumably be other situations when rescission would also be reasonable. Ultimately, what is reasonable in any particular instance will depend on specific facts about, among other things, the institution's admissions process and the nature of the student's criminal history. But there remain limits on when an institution may make decisions regarding admission based on criminal history—limits that, in practice, likely become more

---

[22] Because you have asked about an institution's ability to rescind the admission of an enrolled student when it discovers criminal history *after* the student has enrolled, we do not decide the extent of an institution's ability to rescind admission based on criminal history that it knew about and considered before the time of enrollment. We suspect, however, that it might be even more difficult to rescind admission in such cases.

difficult to overcome once a student has enrolled and increasingly difficult to overcome the longer the student has been enrolled.[23]

To be sure, our reading of the Act does not go as far as some members of the General Assembly and some advocates might have hoped in removing barriers to higher education for applicants with a criminal history. For example, one advocate explained that "no one should be denied access to an education" based on safety concerns derived from criminal history, given that the State would have already determined "that they have served their time and that them being released would not necessarily be a danger to public safety" in any other setting. *See Hearing on S.B. 543 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2017 Leg., Reg. Sess. (Feb. 15, 2017) (statement of Caryn York, Job Opportunities Task Force). Although that argument may have force as a matter of policy, the reading of the Act outlined in this opinion—reflecting an apparent compromise—is more consistent with the language of the statute as ultimately enacted and with the legislative history.

Our reading also still advances in at least four important ways the purpose behind the legislation to expand educational opportunity for those with criminal histories. First, prohibiting questions about criminal history on initial admissions applications eliminates a deterrent for many applicants who might otherwise decline to apply out of fear that criminal history would be an automatic disqualifier. As Delegate McIntosh explained on the floor, this was a main goal of the Act. Second, prohibiting institutions from automatically or unreasonably restricting admission based on criminal history prevents those same applicants from being categorically denied admission without any real consideration of their individual qualifications and circumstances. Third, recognizing limits on the ability of institutions to rescind admission after enrollment prevents institutions from undermining the rehabilitative purposes of the Act. Finally, requiring institutions to develop a written process to deny or limit a student's access to campus residency or admission to a specific academic program promotes careful decision-making and provides qualified students with an opportunity to overcome their

---

[23] Apart from the Act, an enrolled student would still be entitled to receive whatever process is due under the circumstances, which might further limit the discretion of institutions to rescind admission. *See, e.g.*, *Fuller*, 909 F. Supp. 2d at 877-78 (reviewing whether a public university's decision to dismiss a student based on criminal history was "careful and deliberate"); *Harwood*, 130 Md. App. at 484 (reviewing whether a private university acted "arbitrarily and capriciously" in dismissing a student, even though the Due Process Clause does not apply).

past and pursue the programs and related careers of their choice. All of this furthers the purpose of the Act without taking away the discretion of institutions of higher education to "choos[e]" whom they "want to admit" and without "prescribing" any particular admissions decisions. House Floor Proceedings No. 2 (Jan. 11, 2018) (statement of Del. McIntosh).

## B.  *Juvenile Records*

Your second question is whether the Act permits an institution of higher education to make inquiries into and consider juvenile records as part of the admissions process. The Act, by its terms, applies only to "criminal history," which is defined for purposes of the Act as "an arrest or a criminal conviction." ED § 26-501(c). Thus, we must first determine whether juvenile records constitute "criminal history" as defined by the Act. If juvenile records are "criminal history," then institutions would not be able to ask about them on the admissions applications covered by the Act but could, at a later stage of the admissions process, inquire into and consider them to the extent permitted by the Act. By contrast, if juvenile records are not "criminal history," then institutions would be able to inquire into and consider them at any stage of the admissions process, including initial admissions applications, unless that is prohibited by other existing law.

As an initial matter, we interpret "juvenile records" as used in your question to encompass police and court records generated in the process of determining whether a child committed a delinquent act or other similar violation under Maryland's juvenile delinquency laws. *Cf.* CJP § 3-8A-27.1(a)(3) (defining "juvenile record" in the context of expungement to mean "a court record and police record concerning a child alleged or adjudicated delinquent or in need of supervision or who has received a citation for a violation").

Based on that understanding, it seems clear that records about the adjudication of a child under Maryland's juvenile delinquency laws cannot constitute "criminal history" within the meaning of the Act because an adjudication does not result in "a criminal conviction." In fact, the juvenile delinquency statute expressly provides that "[a]n adjudication of a child [under those laws] . . . is *not a criminal conviction for any purpose*." CJP § 3-8A-23(a)(1) (emphasis added). Instead, a child under the age of 18 who is alleged to have committed a delinquent act—that is, "an act which would be a crime if committed by an adult"—generally has an

adjudicatory hearing in juvenile court, not in criminal court. CJP §§ 3-8A-01(*l*), 3-8A-18. If the juvenile court finds the allegations to be true, then the child is "adjudicated delinquent" but does not receive a "criminal conviction." CJP §§ 3-8A-18(c), 3-8A-23(a)(1). Thus, the plain language of the Act, which applies only to "criminal history," indicates that it does not apply to juvenile records addressing the adjudication of a child.

Although the Act also defines "criminal history" to include an "arrest," and a child under the age of 18 may be "taken into custody . . . pursuant to the law of arrest," CJP § 3-8A-14(a)(2), we doubt that the General Assembly intended juvenile arrest records to constitute "criminal history" under the Act unless they actually lead to a prosecution in the criminal court. Juvenile proceedings are, by design, "civil and not criminal in nature," *In re Anthony R.*, 362 Md. 51, 69 (2000), so it would be strange to classify juvenile arrests that lead to such proceedings as "*criminal* history," ED § 26-501 (emphasis added). Besides, as explained above, it is clear from the language of the statute that juvenile adjudications are not "criminal history," and treating records of arrest differently from records of adjudication seems like a result the General Assembly would not have intended. *See Lockshin*, 412 Md. at 276 (recognizing that statutes are interpreted to avoid results that are "absurd, illogical, or incompatible with common sense"); *see also Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 413-14 (1972) (holding that a juvenile *arrest* was inadmissible as character evidence in a civil action, even though the statute's literal terms only barred admission of juvenile *adjudications*).

Although one could argue that the way to treat juvenile arrests and adjudications the same in this context should be to treat them both as covered by the Act, rather than both *not* covered by the Act, there is no ambiguity in the term "criminal history" as it relates to juvenile adjudications. Such adjudications are simply not "criminal conviction[s]." *See* CJP § 3-8A-23(a)(1) (providing that "[a]n adjudication of a child . . . is not a criminal conviction for any purpose"). Because it is so clear that juvenile proceedings do not result in a "criminal conviction," we read that part of the definition of "criminal history" as informing the meaning of "arrest" in the definition, rather than the other way around. We thus do not think that juvenile records, as a general matter, constitute "criminal history" under the Act.[24] Rather, the Act applies to individuals with

---

[24] However, if a juvenile is prosecuted as an adult in criminal court, then those records would likely be "criminal history" under the Act. As

adult criminal records, either because they were juveniles prosecuted as adults or were arrested or convicted as adults.

That does not mean, however, that juvenile records are unprotected or that institutions of higher education are free to ask about an applicant's juvenile record at any stage of the admissions process. It seems unlikely that the General Assembly would have prohibited institutions from asking about adult criminal records on undergraduate admissions applications—and from "automatically or unreasonably" restricting admission based on the subsequent discovery of adult criminal records—yet given institutions carte blanche to ask about juvenile records, which are generally viewed as more sensitive because they reflect youthful transgressions that, if disclosed, might unfairly hinder individuals into adulthood. *See M.P. v. Schwartz*, 853 F. Supp. 164, 168 (D. Md. 1994) (recognizing that "special solicitude for the privacy of a minor is a pervasive feature of American law"). After all, given the age at which most applicants seek to enroll as undergraduates, one would expect the Legislature to have been just as concerned, if not more concerned, about juvenile records.

Rather than expressly protect juvenile records in the Act, the General Assembly apparently assumed that juvenile records would remain confidential during the admissions process based on other existing law. In fact, during the veto override debate in the House, one delegate who opposed the bill contrasted a criminal record with "a small mistake . . . held in a juvenile file" that is "not to be released," and indicated that, as to juvenile records, he believed the Legislature had "already taken care of that [problem]." House Floor Proceedings No. 2 (Jan. 11, 2018) (statement of Del. Folden).

---

we have explained in prior opinions, "if a juvenile is charged as an adult with a crime which falls outside the original jurisdiction of the juvenile court, the confidentiality provisions [applicable to juvenile records] do not apply." Md. Op. Att'y Gen. No. 94-005, 1994 WL 31853 (Jan. 24, 1994) (unpublished) (discussing the former CJP § 3-804, which was renumbered CJP § 3-8A-03 by 2001 Md. Laws, ch. 415). In other words, if a juvenile is prosecuted as an adult in criminal court, "the ground rules change. Nothing from the sphere of juvenile causes, including its confidentiality strictures, carries over." *Id*. The juvenile court does not have original jurisdiction when children of certain ages are alleged to have committed certain serious crimes, unless an order removing the case to juvenile court has been filed under § 4-202 of the Criminal Procedure Article. *See* CJP § 3-8A-03(d). Thus, records related to an offense that falls *outside* the original jurisdiction of the juvenile court would likely constitute "criminal history" under the Act.

*But see Hearing on H.B. 694 Before the House Appropriations Comm.*, 2017 Leg., Reg. Sess. (Feb. 14, 2017) (written testimony of Juvenile Law Center) (explaining that "[o]ne of the most immediate consequences befalling youth in the juvenile justice system is the barrier to post-secondary educational opportunities" and contending that "[t]he Act squarely addresses that").

Thus, the question becomes whether any other law prohibits an institution of higher education from inquiring into and considering juvenile records as part of the admissions process. We look to Maryland's juvenile delinquency statute as the most likely place to find such a law. Under that statute, "police records" and "court records" concerning juveniles are generally confidential. CJP § 3-8A-27. More specifically, those juvenile records "may not be divulged, by subpoena or otherwise, except by order of the court upon good cause shown or as otherwise provided in [the Education Article]." *Id.*[25] The purpose of that confidentiality provision, as we have explained in prior opinions, is "to protect and to promote the rehabilitation of children who come within the ambit of the juvenile courts." 85 *Opinions of the Attorney General* 249, 255 (2000) (citation and internal quotation marks omitted) (discussing the former CJP § 3-828, which was renumbered as CJP § 3-8A-27 by 2001 Md. Laws, ch. 415); *see also Lopez-Sanchez v. State*, 155 Md. App. 580, 598 (2004), *aff'd*, 388 Md. 214 (2005) (explaining that "[t]he General Assembly enacted the Juvenile Causes Act . . . to advance its purpose of rehabilitating the juveniles who have transgressed to ensure that they become useful and productive members of society"). Based on that "clear protective intent," inspection of juvenile records is "categorically denied" to members of the public, unless allowed by court order. 55 *Opinions of the Attorney General* 320, 324-25 (1970).

But while CJP § 3-8A-27 would no doubt prevent the police or courts from responding to an inquiry about juvenile records from

---

[25] The applicable sections of the Education Article pertain only to elementary and secondary schools. More specifically, ED §§ 7-303 and 22-309 permit, respectively, disclosure of information to certain local school system personnel when a student has been arrested for a "reportable offense" and disclosure of information between the Maryland State Department of Education and Department of Juvenile Services ("DJS") to ensure the appropriate delivery of services to students in the Juvenile Services Educational Program. There is no similar provision permitting or requiring the disclosure of juvenile records to institutions of higher education. For sake of completeness, we also note that CJP § 3-8A-27 has additional exceptions for other enumerated uses of juvenile records, but none of those are relevant here.

an institution of higher education, it is less clear whether it would also prevent the institution from asking applicants directly about their juvenile records or protect applicants from having to respond to those questions on admissions applications. *See, e.g.*, Joy Radice, *The Juvenile Record Myth*, 106 Geo. L.J. 365, 414 (2018) (explaining that confidentiality statutes are often not as protective as they might appear at first). We have never before addressed whether, under CJP § 3-8A-27, an institution of higher education may ask applicants directly about their juvenile records, nor have the Maryland courts specifically addressed that question.

Other state attorneys general who addressed similar questions have reached varying conclusions. The Wisconsin Attorney General, for example, concluded that the state's confidentiality statute as it existed at the time prevented a third party from inquiring of an applicant about juvenile records. Wis. Op. Att'y Gen. No. 97-78, 1978 WL 34047 (Dec. 28, 1978). The Attorney General explained that, because the confidentiality statute provided that "contents of juvenile records shall not be disclosed except by order of the court," a licensing board could not include on its license application a question about whether applicants were ever "found delinquent by a juvenile court." *Id.* In fact, such a question would be "contrary to legislative policy" given a determination by the state's legislature "that the best interests of the child and the administration of the juvenile justice system require protecting the confidentiality of police, court and social agency records relating to juveniles." *Id.*[26] More recently, the Alabama Attorney General similarly concluded that an employer could not question applicants about juvenile adjudications, reasoning that "[r]equiring a person to disclose independently their juvenile history that is not discoverable through official channels defeats the purpose of the statutes to protect the confidentiality and anonymity of the juvenile." Ala. Op. Att'y Gen. No. 2005-11, 2004 WL 3188043 (Oct. 26, 2004).

---

[26] A subsequent opinion by the Wisconsin Attorney General in the context of employment noted that this conclusion is no longer valid because the state's legislature amended the statute at issue to include adjudications of delinquency in the definition of "criminal record," presupposing that an employer may ask questions about that criminal record. Wis. Op. Att'y Gen. No. 15-90, 1990 WL 596869 (Apr. 24, 1990). In Maryland, however, juvenile records are not criminal records. *See* CJP § 3-8A-23(a)(1). The statute analyzed in the Wisconsin Attorney General's 1978 opinion is thus far more analogous to Maryland's confidentiality statute.

But at least two other state attorneys general have reached the opposite conclusion, albeit with some qualifications. The North Dakota Attorney General decided that, because nothing in that state's confidentiality statute expressly prohibited a licensing board from inquiring about an applicant's juvenile record, "[w]hether a state licensing board requests on a licensure application information regarding juvenile adjudications is a policy matter that must be decided by the licensing board." N.D. Op. Att'y Gen. No. 98-02, 1998 WL 15037 (Jan. 8, 1998).[27] Similarly, the Virginia Attorney General concluded that, although state law provided for the confidentiality of records maintained by the juvenile court, it did not "specifically prevent a state agency or private individual from inquiring of a juvenile concerning his juvenile record," and thus the Division of Motor Vehicles could ask minors applying for a driver's license about their juvenile records. 1976-77 Va. Op. Att'y Gen. No. 140, 1977 WL 27321 (Jan. 14, 1977). But, in that situation, the question on the driver's license application at issue was "specifically required" by the Motor Vehicle Law, whereas there is no Maryland law that would specifically require a higher education institution to ask about juvenile history. *Id*.[28]

Like the attorneys general in Wisconsin and Alabama, we conclude that our state's juvenile delinquency statute prohibits an institution of higher education from asking applicants about their juvenile records as part of the admissions process, especially when that statute is read in conjunction with the Act. Even if the literal terms of CJP § 3-8A-27 protect only against the disclosure of

---

[27] The North Dakota Attorney General did, however, urge licensing boards to consider, as a matter of policy, whether they really needed to ask about juvenile history information, given that "the Legislature did not intend juvenile adjudications to hamper or impede the progress of youth or otherwise jeopardize their future," and that "[r]elying on juvenile adjudications to deny licensure would be contrary to that policy." *Id.*

[28] At least one state, Illinois, does specifically prevent inquiries into juvenile records, but only where those records have been expunged. *See* 705 Ill. Comp. Stat. Ann. 405/5-915(2.6) (providing that, after expungement, a person "may not be required to disclose that he or she had a juvenile law enforcement or juvenile court record"); *id.* 405/5-923(c) ("Employers may not ask, in any format or context, if an applicant has had a juvenile record expunged."). Maryland has a provision that prevents "an employer or educational institution" from requiring disclosure of expunged information about criminal charges "in an application, interview or other means," Md. Code Ann., Crim. Proc. ("CP") § 10-109, but that provision—like the Act—does not refer to juvenile records.

juvenile "records," we think that it was also intended to protect the confidentiality of the existence of, and underlying information contained in, those records. *See* CJP § 3-8A-02(b) (providing that the juvenile delinquency statute "shall be liberally construed to effectuate [its] purposes"). More specifically, the juvenile delinquency statute provides, with very limited exceptions, that juvenile records "may not be divulged, by subpoena *or otherwise*," unless allowed by court order. CJP § 3-8A-27 (emphasis added). That implies that access to juvenile records by other means, including by asking applicants directly, is prohibited, particularly in the context of higher education where allowing for such an inquiry would be in tension with the later-enacted Maryland Fair Access to Education Act.[29]

After all, the context in which we read the language of the juvenile delinquency statute includes "its relationship to earlier and subsequent legislation." *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 515 (1987). As both the Court of Appeals and the Supreme Court have recognized, a later-enacted statute can often shed light on the meaning of an earlier enactment. *See In re Douglas P.*, 333 Md. 387, 391-94 (1994) (finding that "when considered in light of [a later-enacted statute's] premise," a prior statute intended child abuse to be the basis for a delinquent act under Maryland's juvenile laws, even though the earlier statute had not expressly said so); *see also, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 143-44 (2000) (concluding that agency did not have jurisdiction over tobacco products because its statute would require removal of products from the market and such a ban would be contrary to congressional intent expressed in more recent tobacco-specific legislation); *United States v. Fausto*, 484 U.S. 439, 453 (1988) (explaining that the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute").

We thus consider the language of CJP § 3-8A-27 in light of the more recent Act's apparent "premise," *In re Douglas P.*, 333 Md. at 394, that juvenile records would remain confidential during the admissions process. Not only does CJP § 3-8A-27 imply that,

---

[29] You have not asked, and we do not decide here, whether CJP § 3-8A-27 prohibits other third parties from asking applicants about their juvenile records directly for other purposes, such as employment or licensure.

unless an express exemption applies, the contents of juvenile records may not be divulged except by court order, but the Act further implies, by prohibiting inquiries only into adult criminal history, that juvenile records must already have been protected from inquiry under § 3-8A-27.[30]  In fact, the General Assembly might have declined to refer to juvenile records in the Act because to do so could have left them *less* protected.  That is, if juvenile records had been included in the definition of "criminal history" under the Act, the Act would have prohibited questions on the initial admissions application but would have *allowed* questions at a later stage of the admissions process.

It thus seems more likely that the General Assembly intended for CJP § 3-8A-27 to keep juvenile records confidential than for such records to be so conspicuously unprotected.  As we have explained in prior opinions, the General Assembly "intended not only to provide the most ideal rehabilitative environment possible for a child by making his acts of delinquency inviolate insofar as public disclosure is concerned, but also intended to protect an adult's reputation from being damaged from transgressions which amount to acts of delinquency during his youth."  55 *Opinions of the Attorney General* at 321-22.  If the contents of confidential juvenile records could be disclosed merely by requiring an applicant to personally divulge their contents in response to a question on an admissions application, that would erode, if not render entirely pointless, the statute's protective purpose, as

---

[30] Even when the Common Application included a criminal history question, the question did not implicate juvenile records.  That question and the accompanying instructions stated:

> Have you ever been adjudicated guilty or convicted of a misdemeanor or felony? Note that you are not required to answer "yes" to this question, or provide an explanation, if the criminal adjudication or conviction has been expunged, sealed, annulled, pardoned, destroyed, erased, impounded, or otherwise required by law or ordered by a court to be kept confidential.

A brochure prepared in collaboration with the Maryland Office of the Public Defender advised that "[b]ecause Maryland juvenile records are confidential, you can answer 'no' to this question if you only have a juvenile record in Maryland, you don't have an adult record, and you don't have a juvenile record in another state."  *See* National Juvenile Defender Center, *Your Juvenile Record Can Affect Your Future*, https://njdc.info/wp-content/uploads/2018/04/Your-Juvenile-Record-Can-Affect-Your-Future.pdf.

institutions of higher education would easily be able to circumvent the law that otherwise prohibits them from accessing that information. *See, e.g.*, Ala. Op. Att'y Gen. No. 2005-11, 2004 WL 3188043 (2004). It also makes little sense to permit educational institutions to ask about an applicant's juvenile history when the institution cannot obtain the underlying records and thus "cannot confirm the truthfulness of a response to a question regarding juvenile adjudications." N.D. Op. Att'y Gen. No. 98-02, at *2.[31]

Thus, even though the Act generally does not apply to juvenile records, we think that CJP § 3-8A-27, especially when read in conjunction with the Act, prohibits an institution of higher education from asking about those records on the initial admissions application—as is the case for criminal history under the Act—and also later in the admissions process.[32] In important ways, then, Maryland law may be even more protective of the information in juvenile records than the Act would be of criminal history.

We caution, however, that it is not clear whether CJP § 3-8A-27 would prohibit institutions of higher education from asking applicants about juvenile records *from other states*. Each year, Maryland institutions receive applications from out-of-state applicants, whose juvenile records may or may not be protected by analogous confidentiality statutes in their respective states. Although it would make sense to treat out-of-state applicants the

---

[31] To be sure, we have concluded in prior opinions that "observable facts that exist independently of the contents of a record" do not constitute "records." 78 *Opinions of the Attorney General* 240 (1993) (concluding that DJS could admit members of the public to observe juvenile facilities, because "merely by affording such access the Department does not disclose the name of any child or otherwise provide information from the child's record"). But asking applicants about their juvenile records directly does not give rise to facts that exist independently of those records. *See Johnson v. State*, 3 Md. App. 105, 115 (1967) (noting that it is impermissible to attack a witness's credibility by asking about juvenile records directly, because juvenile proceedings are not admissible). To the contrary, such questions seek the records themselves or their "contents," CJP § 3-8A-27, and that information is confidential.

[32] Although one could argue that CJP § 3-8A-27 only means that an applicant may not be required to answer such questions (and does not prohibit asking the questions), we doubt that the General Assembly intended that institutions of higher education be able to ask such questions and for confidentiality to depend on whether juveniles are aware of their right not to answer.

same as other applicants for this purpose and we urge institutions to take that approach, it might not be strictly required. For that reason, the General Assembly may wish to clarify the extent to which the Act applies to juvenile records or the extent to which CJP § 3-8A-27 prohibits institutions of higher education from asking about juvenile records, both from Maryland and from other states.

As a final point, although CJP § 3-8A-27 prevents institutions of higher education from *inquiring into* an applicant's juvenile records, it does not address to what extent an institution may *consider* that information if it is somehow discovered via other means. It seems unlikely to us that institutions in Maryland were taking this information into account before the Act or that they would do so now. Nevertheless, when that provision is read in conjunction with the Act, we think the General Assembly would intend that the institution "consider the State's policy to promote the admission of students with criminal records" and to apply that same general policy to students with juvenile records so as "to provide th[o]se students with the opportunity to obtain the knowledge and skills needed to contribute to the State's economy." ED § 26-506.

### III
### Conclusion

In our opinion, the Act permits an institution of higher education to rescind an enrolled student's admission based on criminal history discovered after enrollment but, as with other decisions regarding admission under the Act, the institution may not do so "automatically or unreasonably," ED § 26-504, and must also provide the student whatever process is due under the circumstances. We doubt, however, that the General Assembly intended for this to be the primary way to address criminal history under the Act, and the circumstances under which an institution may rescind a student's admission after enrollment will likely be narrower than the circumstances under which an institution may deny admission or even rescind an offer of admission before enrollment.

Finally, although the Act generally does not apply to juvenile records, we think that Maryland's juvenile delinquency statute, especially when read in conjunction with the Act, prohibits an institution of higher education from inquiring into juvenile records as part of the admissions process. To the extent juvenile records are otherwise discovered, we think the State's policy to promote

the admission of students with criminal histories likely extends to those with juvenile histories as well.

Brian E. Frosh
Attorney General of Maryland

Alan J. Dunklow
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice